JINA L. CHOI (NY Bar No. 2699718)
STEVEN BUCHHOLZ (Cal. Bar No. 202638)
  Buchholzs@sec.gov
JENNIFER J. LEE (Cal. Bar No. 261399)
  Leejen@sec.gov

Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
44 Montgomery Street, Suite 2800
San Francisco, California 94104
Telephone:  (415) 705-2500
Facsimile:  (415) 705-2501

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. C- |
| Plaintiff, | |
| v. | **COMPLAINT** |
| JOHN GRAY, CHRISTIAN KELLER, KYLE MARTIN, and AARON SHEPARD, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission ("Commission") alleges:

**<u>SUMMARY OF THE ACTION</u>**

1.     From approximately 2009 through 2012, John Gray, an equities research analyst for a major brokerage firm, and his friend, Christian Keller, a finance employee at two public companies successively, led an insider trading scheme in which they secretly traded profitably on confidential merger and earnings information regarding Keller's employers.

2.     Gray and Keller arranged to use the brokerage account held in the name of a third participant in the scheme, defendant Kyle Martin, in order to keep their respective employers from learning of their trading.  Gray, who acted as the hub between Keller and Martin, was primarily responsible for placing the trades in Martin's account and splitting the trading profits among himself, Keller, and Martin.

3.      Using the information Keller was entrusted in confidence from his employer, Applied Materials, Inc. ("Applied Materials"), Keller and Gray profitably traded options in advance of Applied Materials' acquisitions of Semitool, Inc. ("Semitool") in 2009, and Varian Semiconductor Equipment Associates, Inc. ("Varian") in 2011.  Then, after Keller became employed by Rovi Corporation ("Rovi") in 2012, Keller and Gray repeatedly used important, nonpublic information Keller learned as an insider to profitably trade Rovi securities ahead of its public announcements about its first and second quarter 2012 financial results.

4.      To avoid detection, Gray and Keller used disposable prepaid mobile phones to discuss the trades, and Gray also made structured cash withdrawals to kick back profits to Keller.  Despite these efforts to avoid detection, Gray traded in his own account and tipped a fourth person, defendant Aaron Shepard, to trade based on the confidential information passed from Keller.  In total, the scheme reaped illegal profits totaling approximately $743,000.

## JURISDICTION AND VENUE

5.      The Commission brings this action pursuant to Sections 21(d), 21(e), and 21A of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d), 78u(e), and 78u-1].

6.      This Court has jurisdiction over this action pursuant to Sections 21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(e), 78u-1 and 78aa].

7.      Defendants, directly or indirectly, made use of the means or instrumentalities of interstate commerce, or of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged herein.

8.      Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] because a substantial part of the acts and transactions constituting the violations alleged in this Complaint occurred within the Northern District of California, and because one or more Defendants resides or transacts business in the district.

## INTRADISTRICT ASSIGNMENT

9.      This action is appropriate for assignment to the San Francisco Division, pursuant to Civil Local Rule 3-2(d), because a substantial part of the events alleged herein occurred in San Francisco County.

**Defendants**

10.    Christian Briggs Keller, age 40, resides in Los Altos, California.  From 2005 through January 2012, Keller was a financial analyst for Applied Materials.  In January 2012, Keller joined Rovi as Vice President for Investor Relations and Finance.

11.    John Gray, age 38, resides in Redondo Beach, California.  From 2008 through 2011, Gray was an equity research analyst and registered representative for Barclays Capital, a brokerage firm affiliated with a major international bank.

12.    Kyle Martin, age 35, resides in Santa Clarita, California.  From 2008 to 2012, Martin worked at a car dealership in Beverly Hills, California.

13.    Aaron Shepard, age 37, resides in San Francisco, California.  From 2008 to 2012, Shepard was self-employed in the business of installing car stereos.

**Other Relevant Entities and Individuals**

14.    Applied Materials, Inc. is a Delaware corporation with its principal place of business in Santa Clara, California.  Its shares are registered pursuant to Section 12(b) of the Exchange Act and trade on the Nasdaq Stock Market (ticker: AMAT).  Applied Materials designs and supplies semiconductor fabrication equipment.

15.    Semitool, Inc. was a Montana corporation with its principal place of business in Kalispell, Montana until November 2009, when it was acquired by Applied Materials.  Before the acquisition, Semitool's common shares were registered pursuant to Section 12(b) of the Exchange Act and traded on the Nasdaq Stock Market (ticker: SMTL).  Semitool created semiconductor manufacturing equipment.

16.    Varian Semiconductor Equipment Associates, Inc. was a Delaware corporation with its principal place of business in Gloucester, Massachusetts until May 2011, when it was acquired by Applied Materials.  Before the acquisition, Varian's common shares were registered pursuant to Section 12(b) of the Exchange Act and traded on the Nasdaq Stock Market (ticker: VSEA).  Varian supplied ion implantation equipment used to fabricate semiconductor chips.

17.     Rovi Corporation is a Delaware corporation headquartered in Santa Clara, California. Its shares are registered pursuant to Section 12(b) of the Exchange Act and trade on the Nasdaq Stock Market (ticker: ROVI).  Rovi provides digital media entertainment solutions.

## FACTUAL ALLEGATIONS

### A.  Unlawful Trades Based on Keller's Access to Confidential Information at Applied Materials

#### *Keller's Access to Confidential Information at Applied Materials*

18.     From 2005 through January 2012, Keller was employed by Applied Materials as a financial analyst.  From 2009 through 2011, Keller was primarily involved with Applied Materials mergers and acquisitions of other companies, including other publicly-traded companies.  While at Applied Materials, Keller was subject to specific restrictions regarding confidential information that he was privy to in the course of his employment.  Among other things, Keller signed a confidentiality agreement in which he agreed not disclose "confidential information," including "business plans" and "strategies," to anyone outside Applied Materials.  Keller also signed non-disclosure agreements specific to particular planned acquisitions by Applied Materials that prohibited him from sharing the confidential information with anyone outside of the designated deal teams working on the acquisitions.

#### *2009 Semitool Trades*

19.     In or about August 2009, Keller learned that Applied Materials was planning to acquire Semitool.  In October 2009, Keller signed a non-disclosure agreement with respect to the deal, in which he acknowledged that he would "not disclose any Confidential Information" to persons other than the designated deal team.  As a member of the deal team, Keller participated in Applied Materials' due diligence of Semitool and, in the course of this work, he was entrusted with confidential information regarding the acquisition including the timing of the planned acquisition.

20.     In or around October 2009, Keller approached Gray with an idea for an illicit trading scheme.  Keller told Gray that Applied Materials planned to acquire Semitool, and suggested that they could profit from this information if Gray were to trade Semitool securities on their behalf. Keller and Gray discussed using an account held in the name of Gray's friend, Kyle Martin, in order

to avoid detection.  Both Keller and Gray sought to conceal the trading from their respective employers as they were each subject to restrictions against trading in the securities; indeed, Gray was subject to restrictions on his ability to trade individual securities.  They believed using Martin's account would avoid scrutiny since Keller was not friends with Martin.

21.    Keller and Gray discussed a profit sharing agreement, pursuant to which the profits would be split approximately one-third each to Gray, Keller, and Martin.  Gray was responsible for determining the size and timing of the trades and was primarily responsible for placing the trades.

22.    Gray spoke with Martin about joining the trading scheme with his "buddy from Applied Materials," and he described the profit sharing agreement and the details Gray had learned from Keller about Applied Materials' expected acquisition of Semitool.  Martin immediately opened a specific, new brokerage account to segregate the trades the three would place in their scheme from his existing brokerage account.

23.    On or about November 12, 2009, Gray assisted Martin in purchasing Semitool call options in the new account.  That same day, Martin purchased Semitool call options in his separate brokerage account.  On November 16, 2009, Martin and Gray purchased additional Semitool call options in the new account.

24.    On November 17, 2009, Semitool and Applied Materials announced publicly, before the close of the market, that Applied Materials would be acquiring Semitool via a tender offer for a price of $11 per share.  By the close of the market that day, Semitool's stock price increased to $11.02 per share, a 31% jump from the prior day's closing price of $8.40 per share.

25.    In total, Gray, Keller, and Martin profited $22,598.23 from the Semitool trades in the segregated account.  In addition, Martin profited by another $4,987.14 from his trades in his separate, personal account.

26.    Keller knew, or was reckless in not knowing, that the information regarding the Semitool acquisition was material and confidential to Applied Materials and Semitool and that he had a duty to his employer to keep the information confidential.

27.    At the time the defendants placed the Semitool trades, Gray and Martin each knew, or were reckless in not knowing, that the information they received regarding Applied Materials'

acquisition of Semitool was confidential and nonpublic, and had been disclosed to them by Keller in breach of his duty.

*2011 Varian Trades*

28.     In or about January 2011, Keller, then a senior financial analyst at Applied Materials, learned that Applied Materials was planning to acquire Varian.  At that time, Keller signed a non-disclosure agreement agreeing not to "disclose any Confidential Information to any person" other than persons working on the transaction as part of the deal team.  Keller worked on due diligence for the acquisition and was entrusted with confidential information regarding the acquisition including that the planned announcement date was April 28, 2011.

29.     In or about March or April 2011, Keller told Gray about the Varian acquisition, and proposed it as a further trading idea pursuant to the profit sharing agreement.  In order to facilitate communications regarding the deal that would be harder to trace to either of them, Keller purchased disposable prepaid phones for himself and Gray.

30.     Based on Keller's disclosure of confidential information, Gray arranged for the purchase of Varian call options in the account established by Martin.  Gray also told Martin about the confidential details regarding the acquisition of Varian by Applied Materials that he learned from his "buddy at Applied Materials"; based on this information, Martin also purchased additional Varian call options in his personal account.

31.     On May 4, 2011, Varian and Applied Materials announced that Applied Materials would be acquiring Varian through an all-cash offer of $66 per share.  That day, Varian's stock price closed at $61.36 per share, a 51.3% jump from the prior day close of $40.55 per share.

32.     In total, Gray, Keller, and Martin profited $137,623.82 from the Varian trades in the "secret" account, with Gray and Martin providing profit kickbacks in cash to Keller.  Martin profited $92,235.59 from the additional Varian trades in his personal account.

33.     Keller knew, or was reckless in not knowing, that the information he learned regarding the Varian acquisition was nonpublic and confidential to Applied Materials and Varian and that he had a duty to his employer to keep the information confidential.

34.     In placing the trades ahead of the public announcement of Applied Materials' Varian acquisition, Gray and Martin each knew that the information they received regarding Applied Materials' acquisition of Varian was confidential, and that the information had been disclosed to them by Keller in breach of his duty of confidentiality.

**B.  Unlawful Trades Based on Keller's Access to Confidential Information at Rovi**

*Keller's Access to Confidential Information at Rovi*

35.     In or about January 2012, Keller joined Rovi as Vice President for Investor Relations and Finance.  Keller was also prohibited from trading Rovi securities while in possession of material nonpublic information regarding Rovi's financial performance, as well as significant changes in management.  Keller, as an employee at Rovi who was privy to such information, owed a duty to Rovi's shareholders to maintain the confidentiality of such information.

*Rovi Q1 2012 Trades*

36.     In or about April 2012, Keller learned that Rovi expected to announce financial results for its first quarter of 2012 (which ended March 30, 2012) that were considered mixed, or not entirely positive.  Keller also learned at about the same time in April that Rovi would also be announcing the resignation of its chief financial officer during the investor call scheduled for the purpose of discussing those results with analysts and other interested members of the public, on or around May 3, 2012.

37.     In or about April 2012, Keller told Gray about Rovi's upcoming earnings results and planned announcement of the CFO departure.  Keller and Gray anticipated that Rovi's stock would decline as a result of the announcement.

38.     To capitalize on this information, Gray traded Rovi put options in his personal account; Gray also told Martin the confidential details regarding Rovi's upcoming announcement, which he learned from Keller.  Martin thus traded Rovi put options in his account pursuant to the profit sharing agreement, and Martin traded additional Rovi put options in a separate, personal account.

39.     Gray also tipped confidential details regarding Rovi's planned Q1 2012 announcement from his "source at Rovi" to another friend, Aaron Shepard.  Gray told Shepard that he had a profit

1  sharing agreement with the "source," whom he referred to as the "right hand" of Rovi's CFO. Based
2  on Gray's disclosure of confidential information regarding Rovi, Shepard purchased Rovi put options
3  in his personal account in advance of Rovi's Q1 2012 announcement.

4      40.    After the close of market on May 3, 2012, Rovi issued a press release reporting Q1
5  2012 financial results consistent with the confidential information that Keller had passed to Gray.
6  Rovi also announced the CFO's resignation during the investor call that day. In response, Rovi's
7  stock price decreased to $26.86 per share, a 4.9% drop from $28.25 per share at the close on May 3.

8      41.    In total, Gray, Keller, and Martin profited $9,488.08 from the Rovi trades in the
9  "secret" account, with Gray providing profit kickbacks in cash to Keller. Gray, Martin, and Shepard
10  realized profits of $30,355.13, $6,987.13, and $25,956.88, respectively, from the Rovi trades in their
11  personal accounts.

12      42.    Keller knew, or was reckless in not knowing, that the information he was entrusted
13  with regarding Rovi's first quarter 2012 announcement – including its mixed financial results and the
14  departure of Rovi's chief financial officer – was nonpublic and confidential to Rovi and that he had a
15  duty to Rovi's shareholders to keep the information confidential.

16      43.    When they placed their trades, Gray, Martin, and Shepard each knew that the
17  information disclosed by Keller regarding Rovi's upcoming announcement about its first quarter
18  2012 financial results and the departure of its CFO was nonpublic and confidential, and that the
19  information had been disclosed by Keller in breach of a duty of confidentiality to Rovi and its
20  shareholders.

21  *Rovi Q2 2012 Trades*

22      44.    In or about June 2012, Keller learned that Rovi would be making a public
23  announcement before the end of its second fiscal quarter of 2012 (ended June 30, 2012) to lower its
24  previously-stated earnings guidance for the quarter and for the full fiscal year 2012. By early July
25  2012, Keller was personally involved in Rovi's retention of a crisis management firm to handle the
26  important announcement about Rovi's lower expected earnings guidance, and Keller understood that
27  the public announcement would take place on or around July 17, 2012.

28

45.     In or about June or early July 2012, Keller told Gray about Rovi's upcoming announcement regarding its lowered earnings guidance, as a trading idea pursuant to the profit sharing agreement.  In order to facilitate communications regarding the announcement and reduce the chance of detection, Keller again purchased prepaid disposable phones for himself and Gray.

46.     Gray told both Martin and Shepard about the confidential information regarding Rovi's announcement that he had learned from his "buddy" at Rovi.  Martin traded Rovi put options pursuant to the profit sharing agreement with Gray and Keller, while Shepard traded Rovi put options in his personal account.

47.     On July 17, 2012, Rovi issued its preannouncement through a press release reporting that the company had lowered Q2 guidance from $180 million to $158 million, and lowered FY guidance.  Rovi's stock price dropped to $11.84, a 33% decrease from $17.64 at the close of the prior trading day.

48.     Gray, Keller, and Martin profited $247,758.60 from the Rovi trades as part of the profit sharing agreement, while Gray profited $30,819.93 from the additional Rovi trades in his personal account.  Shepard profited $135,431.48 from his Rovi trades.

49.     Keller knew, or should have known, that the information he learned regarding Rovi's financial results and preannouncement was material and confidential to Rovi and that he had a duty to Rovi's shareholders to keep the information confidential.

50.     In sharing the information with Martin and Shepard, Gray knew that the information disclosed by Keller about Rovi's financial results and planned announcement was confidential, and had been disclosed by Keller in breach of his duty of confidentiality.

51.     Martin and Shepard also each knew that the information disclosed by Gray about Rovi's financial results and planned announcement was confidential, and had been disclosed by Keller in breach of his duty of confidentiality.

52.     Within a few weeks of the successful Rovi trades, Gray drove from his residence in Southern California to Keller's residence in Northern California to open a bank account.  The purpose of the bank account was to facilitate cash withdrawals and share the trading profits with Gray and Keller.  Martin transferred $120,000 from his brokerage account to the new bank account, with

1   $100,000 intended for Gray, and $20,000 intended for the "buddy."  Shepard similarly provided

2   $10,000 in profit kickbacks to Gray.  Gray subsequently provided profit kickbacks of cash to Keller

3   from the new bank account.

4                                    **DEFENDANTS' TOLLING AGREEMENTS**

5           53.     In October 2014, Defendants Gray, Keller, and Martin each signed tolling agreements

6   with the Commission.  Each tolling agreement specifies a period of time (a "tolling period") in which

7   the "running of any statute of limitations applicable to any action or proceeding against [the

8   defendant] authorized, instituted, or brought by or on behalf of the Commission or to which the

9   Commission is a party arising out of the investigation ("any proceeding"), including any sanctions or

10  relief that may be imposed therein, is tolled and suspended for the period beginning on October 15,

11  2014 through January 15, 2015…."  Each tolling agreement further provides that the defendant and

12  any of his agents or attorneys "shall not include the tolling period in the calculation of any running of

13  the statute of limitations or for any other time-related defense applicable to any proceeding, including

14  any sanctions or relief that may be imposed therein, in asserting or relying upon any such time-related

15  defense."

16

17                                    **FIRST CLAIM FOR RELIEF**
                **Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**
18                          **(Against Defendants Gray, Keller, Martin, and Shepard)**

19          54.     The Commission re-alleges and incorporates by reference paragraphs 1 through 53, as

20  though fully set forth herein.

21          55.     Defendants, with scienter, directly or indirectly:

22          a.   employed devices, schemes, or artifices to defraud;

23          b.   made untrue statements of material facts or omitted to state material facts necessary in

24               order to make the statements made, in the light of the circumstances under which they

25               were made, not misleading; and

26          c.   engaged in acts, practices, or courses of business which operated or would operate as a

27               fraud or deceit upon other persons, including purchasers and sellers of securities;

28

2cc899de7dc3492f

1        in connection with the purchase or sale of securities, by the use of means or instrumentalities

2 of interstate commerce, of the mails, or the facilities of a national securities exchange.

3        56.     By reason of the foregoing, defendants violated, and unless restrained and enjoined

4 will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5

5 thereunder [17 C.F.R. § 240.10b-5].

6 **SECOND CLAIM FOR RELIEF**

7 **Violations of Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)]
and Rule 14e-3 [17 C.F.R. § 240.14e-3] Thereunder
(Against Defendants Gray, Keller, and Martin)**

8

9        57.     Paragraphs 1 through 56 are re-alleged and incorporated herein by reference.

10        58.     After Applied Materials had taken a substantial step or steps to commence or had

11 commenced a tender offer, defendants:

12     a.     Purchased or sold or caused to be purchased or sold the securities to be sought by the

13           tender offer while in possession of material information relating to such tender offer

14     b.     which information they knew or had reason to know is nonpublic, and

15     c.     which they knew or had reason to know had been acquired directly or indirectly from

16           the offering company, the issuing company, or any officer, director, partner or

17           employee acting on behalf of the offering or issuing companies.

18        59.     By reason of the foregoing, defendants violated, and unless restrained and enjoined

19 will continue to violate, Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 [17

20 C.F.R. § 240.14e-3] thereunder.

21 **PRAYER FOR RELIEF**

22        WHEREFORE, the Commission respectfully requests that this Court enter a judgment:

23 **I.**

24        Finding that Defendants Gray, Keller, Martin, and Shepard committed the violations alleged

25 herein;

26 **II.**

27        Permanently enjoining each of Defendants Gray, Keller, Martin, and Shepard, their officers,

28 agents, servants, employees, and attorneys, and those persons in active concert or participation with

1  them who receive actual notice of the injunction by personal service or otherwise, and each of them,

2  from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. §§ 78j(b)], and

3  Rule 10b-5 thereunder [17 C.F.R. §§ 240.10b-5];

4  **III.**

5  Permanently enjoining each of Defendants Gray, Keller, and Martin from directly or

6  indirectly violating Section 14(e) of the Exchange Act [15 U.S.C. § 78n(e)] and Rule 14e-3 [17

7  C.F.R. § 240.14e-3] thereunder;

8  **IV.**

9  Ordering each of Defendants Gray, Keller, Martin, and Shepard to disgorge, with

10  prejudgment interest, all illicit trading profits, other ill-gotten gains received, and/or losses avoided as

11  a result of the conduct alleged in the Complaint, including, as to each defendant, their own illicit

12  trading profits, other ill-gotten gains, and/or losses avoided, and the illicit trading profits, other ill-

13  gotten gains, and/or losses avoided of their direct and downstream tippees;

14  **V.**

15  Barring Defendant Keller pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. §

16  78u(d)(2)] from acting as an officer or director of any issuer that has a class of securities registered

17  pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports

18  pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)];

19  **VI.**

20  Ordering Defendants Gray, Keller, Martin, and Shepard each to pay civil penalties pursuant to

21  Section 21A of the Exchange Act [15 U.S.C. § 78u-l]; and

22  **VII.**

23  Granting such other relief as this Court may deem just and appropriate.

24  Date:  February 5, 2015

25  _____/s/ Jennifer J. Lee_____
          JENNIFER J. LEE
26        Attorney for Plaintiff
          SECURITIES AND EXCHANGE
27        COMMISSION

28